JUDGE FURMAN

16 CV 3568

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------
ALSTOM AND ALSTOM TRANSPORT          x
HOLDINGS B.V.,                       :   CIVIL ACTION NO. _____
                                     :
            Plaintiffs,              :   COMPLAINT FOR SPECIFIC
                                     :   PERFORMANCE AND
    v.                               :   PETITION UNDER THE
                                     :   FEDERAL ARBITRATION ACT
GENERAL ELECTRIC COMPANY,            :   TO COMPEL PROCEEDINGS
                                     :   BEFORE THE INDEPENDENT
            Defendant.               :   ACCOUNTING FIRM
                                     :
---------------------------------------
                                     x

      Plaintiffs Alstom and Alstom Transport Holdings B.V. (collectively "Alstom" or "Plaintiffs") state for their complaint for breach of contract against General Electric Company ("GE" or "Defendant") and, in the alternative, their petition under the Federal Arbitration Act to compel proceedings before the Independent Accounting Firm, as follows:

## THE PARTIES

      1.    Alstom is a *société anonyme* incorporated under the laws of France, having its registered office and principal place of business at 3 avenue André Malraux, 92300 Levallois Perret, France. Alstom is a French multinational company that, until November 2015, operated in four main business areas through its various subsidiaries: rail-transport, thermal power, renewable power, and grid. Today, Alstom remains active in the rail-transport business, with products including the AGV, TGV, Eurostar, and Pendolino high-speed trains, in addition to suburban, regional and metro trains, and Citadis trams.

      2.    Alstom Transport Holdings B.V. is a *besloten vennootschap* incorporated under the laws of The Netherlands, having its registered office and principal place of business at

1

Ringdijk 390C, 2983 GS Ridderkerk, The Netherlands. Alstom Transport Holdings B.V. is a wholly owned subsidiary of Alstom.

3. Upon information and belief, GE is a New York corporation with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut, 06828. Upon information and belief, GE is engaged in various businesses, including business appliances, consumer appliances, aviation, consumer electronics, power, power project consulting services, energy management, healthcare, home, housewares, industrial solutions, intelligent platforms, and lighting.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000; Plaintiffs are citizens of France and The Netherlands; and Defendant is a citizen of New York and Connecticut.

5. The Court also has subject-matter jurisdiction under 9 U.S.C. § 203, because the agreement of the parties to submit their accounting dispute for resolution by an independent accountant is an "arbitration agreement" that "fall[s] under" the New York Convention, within the meaning of Chapter 2 of the Federal Arbitration Act. 9 U.S.C. § 201 *et seq.*

6. Personal jurisdiction and venue are proper under the agreement that forms the basis for this action: the Master Purchase Agreement dated as of November 4, 2014 by and between General Electric Company, as Seller, and Alstom and Alstom Transport Holdings B.V., collectively, as Buyer (the "Agreement").

7. This Court has personal jurisdiction over Defendant because the Agreement provides, in pertinent part, that the parties "will be entitled to injunctive relief ... to enforce specifically the terms and provisions of this Agreement," and any "such [a]ction will exclusively be brought and resolved in the U.S. District Court for the Southern District of New York (where

federal jurisdiction exists)." Agreement § 15.14(b), (c). The Agreement further provides that, in the event such an action is brought, each party "irrevocably and unconditionally . . . submits for itself and its property to the exclusive jurisdiction" of this Court "(where federal jurisdiction exists)." *Id.*

8. Venue is proper under 28 U.S.C. § 1391(c) because the Agreement further specifies that, for actions seeking specific performance under the Agreement, each of the parties "agrees that venue would be proper" here, and "waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any such Action." Agreement § 15.14(c).

## FACTUAL BACKGROUND

### I. The Agreement

9. GE agreed in the Agreement to sell its rail-signaling business to Alstom.

10. The Agreement is a binding, written contract between GE and Alstom. In the Agreement, GE explicitly represented that, upon execution and delivery: the "Agreement [would] constitute[] . . . legal, valid and binding obligations of [GE] enforceable in accordance with [its] terms," and that the execution, delivery and performance of the Agreement by GE was "duly authorized by all requisite corporate action on the part of [GE], and no shareholder approval [wa]s required in connection with [GE's] execution, delivery and performance" of the Agreement. Agreement § 5.01.

11. The Agreement was executed and delivered, and became binding, on November 4, 2014. The transaction closed on November 2, 2015 (the "Closing Date").

12. Under the Agreement, Alstom agreed to pay (a) $800 million for GE's rail-signaling business, subject to a post-closing adjustment for (b) working capital and (c) net debt.

3

13.     More specifically, the Agreement states that the "Purchase Price" to be paid by Alstom to GE would consist of the sum of (a) $800 million (the "Base Purchase Price"); (b) either plus the "Final Positive Working Capital Adjustment" (if any) or less the "Final Negative Working Capital Adjustment" (if any); and (c) either plus the "Final Cash Excess" (if any) or less the "Final Debt Excess" (if any). Agreement § 3.01. "Final Positive Working Capital Adjustment" and "Final Negative Working Capital Adjustment" are defined in the Agreement as the difference between the "Net Working Capital of the Business," as determined after the Closing Date, and "Target Working Capital," which is $25 million. "Final Cash Excess" and "Final Debt Excess" are defined in the Agreement as the difference between the "Target Net Debt" ($0) and "Final Net Debt", the latter of which means the "Net Debt" as determined after the Closing Date.

14.     The parties agreed that, on the Closing Date, Alstom would pay GE the Base Purchase Price, subject to certain tax related withholdings permitted under the Agreement. Agreement § 3.02. Alstom complied with this obligation.

15.     With respect to the other consideration, the Agreement specifies a post-closing mechanism for determining adjustments for working capital and net debt. *See* Agreement § 3.05. Payment on account of these adjustments is to be made within ten days after both the working-capital and net-debt adjustments are finally determined. Agreement § 3.06. As explained below, neither the working-capital nor the net-debt adjustments have been finally determined.

**II.     Step One of the Price Adjustment: The Preparation Period**

16.     The first step set forth in the Agreement for determining the post-closing, purchase-price adjustment for working capital and net debt occurred during the "Preparation Period," which started on the Closing Date and expired sixty days later. Agreement § 3.05(a).

4

17. During the Preparation Period, GE was to prepare, and provide to Alstom, a "Proposed Working Capital Statement" and a "Proposed Net Debt Statement." "Proposed Working Capital Statement" is defined in the Agreement as Alstom's proposed calculation of the "Net Working Capital of the Business." "Proposed Net Debt Statement" is defined in the Agreement as Alstom's proposed calculation of the "Net Debt of the Business." Agreement § 3.05(a).

18. Under the Agreement, GE's Proposed Working Capital Statement and Proposed Net Debt Statement were to be prepared in good faith and to set forth GE's calculation of working capital and net debt in "reasonable detail." Agreement § 3.05(a). In preparing these statements, GE was required to apply the "Transaction Accounting Principles" negotiated by the parties and set forth in Exhibit K to the Agreement. Agreement § 3.07.

19. GE was also required to prepare its Statements based on the books and records of the rail-signaling business that it had sold to Alstom. Agreement § 3.07. During the Preparation Period, GE was entitled to make reasonable requests to access Alstom's books and records, as well as a designated representative, to prepare the Proposed Working Capital Statement and Proposed Net Debt Statement. The Agreement states that Alstom would promptly and as reasonably practicable make such information or individuals available. Agreement § 3.05(a).

20. On January 4, 2016, GE submitted its Proposed Working Capital Statement and Proposed Net Debt Statement to Alstom.

21. GE's Proposed Working Capital Statement and Proposed Net Debt Statements each were a single page in length, and GE provided no back-up information for its calculations.

### III. Step Two of the Price Adjustment: The Review Period

22. The second step set forth in the Agreement for determining the purchase-price adjustment was the "Review Period," which began when GE delivered its Proposed Working Capital Statement and Proposed Net Debt Statement to Alstom—*i.e.*, January 4, 2016—and lasted ninety days. Agreement § 3.05(b).

23. Under the Agreement, if Alstom disputed "any item set forth" in GE's Proposed Working Capital Statement and/or Proposed Net Debt Statement, Alstom was to deliver a written notice (the "Dispute Notice") to GE during the Review Period, setting forth "the basis for such dispute and [Alstom's] proposed modifications to the Proposed Working Capital Statement and/or Proposed Net Debt Statement, as the case may be." Agreement § 3.05(c).

24. If, on the other hand, Alstom agreed with GE's Proposed Working Capital Statement and/or Proposed Net Debt Statement, then the statement or statements would be conclusive. Agreement § 3.05(c).

25. Like GE, Alstom was required to apply the Transaction Accounting Principles and to prepare its Dispute Notice based on the books and records of the rail-signaling business. Agreement § 3.07. Like GE, Alstom was also required to provide "reasonable detail" in its Dispute Notice. Agreement § 3.05.

26. Alstom disputed both the Proposed Working Capital Statement and the Proposed Net Debt Statement delivered by GE.

27. Alstom delivered its Dispute Notice to GE on April 4, 2016.

28. The Dispute Notice was over 100 pages and complied with Section 3.05 of the Agreement. It set forth the bases for Alstom's disputed items and Alstom's proposed

modifications in detail, providing GE with Alstom's own calculation of working capital and net debt.

## IV. Step Three of the Price Adjustment: The Resolution Period

29. If, as in this case, Alstom delivers a Dispute Notice, then the parties enter into the third stage for determining the post-closing purchase-price adjustment—the "Resolution Period"—which lasts for thirty days from the date on which Alstom delivers its Dispute Notice to GE. Agreement § 3.05(c).

30. The Agreement states that, during the Resolution Period, the "duly designated representatives" of Alstom and GE "shall negotiate in good faith to reach an agreement as to any matters identified in such Dispute Notice as being in dispute." Agreement § 3.05(c).

31. To the extent GE and Alstom reach agreement "in writing" on disputed matters during the Resolution Period, then GE's Proposed Working Capital Statement and/or Proposed Net Debt Statement, as the case may be, are "revised to incorporate [the agreed-upon] changes," and such changes are "conclusive and binding" upon all parties. Agreement § 3.05(c).

32. GE and Alstom agreed to extend the Resolution Period.

33. The Resolution Period has now expired.

34. GE and Alstom have failed to reach an agreement as to any of the disputed matters set forth in the Dispute Notice within the Resolution period.

35. Further, the parties did not memorialize any agreement "in writing" to resolve any of the matters set forth in the Dispute Notice.

36. As a result, although the Resolution Period has expired, all the matters identified in the Dispute Notice remain in dispute.

### IV. Step Four of the Price Adjustment: The Independent Accounting Firm

37. The Agreement specifies a mechanism for determining those matters set forth in the Dispute Notice that the parties are unable to resolve through negotiation during the Resolution Period: final determination by the Independent Accounting Firm.

38. More specifically, the Agreement states that, if the parties "fail to resolve *all* [the] matters in dispute within the Resolution Period," then "*any* matters identified in [the] Dispute Notice that remain in dispute following the expiration of the Resolution Period" are to be "finally and conclusively determined by" the Independent Accounting Firm. Agreement § 3.05(d) (emphasis added).

39. The Agreement designates "Deloitte"—*i.e.*, "Deloitte Touche Tohmatsu Limited (France office)"—as the Independent Accounting Firm. *Id.* The Agreement states that if Deloitte is "unable or unwilling to serve in such capacity," then the parties are to seek to agree, in writing, upon another "globally recognized accounting firm." *Id.* The Agreement also provides that, if the parties are unable to agree on a replacement for Deloitte within five business days, then either party may request an order from the President of the Paris Commercial Court in summary proceedings to appoint "an internationally reputable bank, accounting firm or valuation firm." *Id.*

40. Under the Agreement, the parties are to instruct the Independent Accounting Firm to make a final determination as to the matters in dispute, and to make that determination "promptly, but no later than forty (40) days after [the Independent Accounting Firm's] acceptance of its appointment." Agreement § 3.05(e).

41. The Independent Accounting Firm's determination is to be "based solely on written presentations" of GE and Alstom, and "not by independent review." *Id.*

8

42. In resolving a dispute, the Independent Accounting Firm is also required to apply the Transaction Accounting Principles. Agreement §§ 3.05, 3.07.

43. The Independent Accounting Firm is to render a written report setting forth its determination as to the disputed matters and the resulting calculations of Final Working Capital, Final Net Debt, the Final Positive Working Capital Adjustment (if any), the Final Negative Working Capital Adjustment (if any), the Final Cash Excess (if any), the Final Debt Excess (if any) and the Post-Closing Adjustment (if any). Agreement § 3.05(e).

44. The Agreement states that the Independent Accounting Firm's determination (as set forth in its written report) is "conclusive and binding upon all [p]arties absent manifest error or gross negligence." *Id.*

## V. GE's Breaches

45. On May 9, GE sent Alstom a letter informing Alstom in writing that it continued to "dispute each and every Item in [Alstom's] Dispute Notice."

46. GE's letter took the position that "nineteen of the [forty] 'Disputed Items'" set forth in the Dispute Notice (which GE called "Excluded Items") "[we]re outside the scope of the working capital adjustment process" because Alstom had allegedly "impermissibly substitute[d] [its] judgments for GE's and relie[d] on information purportedly developed or received by Alstom after the date of the Closing."

47. GE's letter also informed Alstom that it was launching an arbitration before the International Court of Arbitration of the International Chamber of Commerce (ICC) to declare (1) that the Independent Accounting Firm "does not have the authority to render a binding determination" as to the so-called Excluded Items and (2) the Dispute Notice did not provide adequate detail so that the Resolution Period (which had ended) should be deemed not to have begun.

9

48. GE later provided Alstom with a courtesy copy of the Request for Arbitration that it had allegedly submitted to the ICC on May 9.

49. Through its words and deeds, GE has made clear that it refuses to submit all the matters identified in the Dispute Notice to the Independent Accounting Firm.

50. GE's refusal to submit the matters set forth in the Dispute Notice to the Independent Accounting Firm is a breach of contract.

51. GE's initiation of arbitration proceedings before the ICC is also a breach of contract, because the dispute-resolution provision of the Agreement that GE invoked (which is set forth in Section 15.13) is subject to "Section 3.05 with respect to any disputes to be resolved by the Independent Accounting Firm," and expressly carves out such disputes. As a result, all the matters that GE is attempting to submit to arbitration under the ICC rules are subject to resolution by the Independent Accounting Firm, and not by the ICC arbitrators.

## COUNT ONE

### BREACH OF CONTRACT

52. Plaintiffs repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53. The Agreement is a written final agreement that is legally binding upon GE.

54. Plaintiffs have performed all requisite conditions, covenants, and promises.

55. Alstom timely provided a Dispute Notice disputing certain matters set forth in GE's calculations of working capital and net debt.

56. Alstom and GE have not reached agreement "in writing" on any of the matters set forth in Alstom's Dispute Notice.

57. The Resolution Period having ended, GE is obligated to submit all the disputed matters set forth in Alstom's Dispute Notice to the Independent Accounting Firm, including by

working with Alstom to instruct Deloitte (or, if Deloitte is unable or unwilling to serve, an alternative Independent Accounting Firm selected pursuant to Section 3.05(d) of the Agreement) to resolve the disputed matters set forth in the Dispute Notice.

58. GE has refused to contact Deloitte or to submit all the matters set forth in the Dispute Notice to the Independent Accounting Firm for resolution.

59. GE's unwillingness to submit all the matters set forth in the Dispute Notice to the Independent Accounting Firm is a breach of the Agreement.

60. GE's commencement of an arbitration before the ICC is also a breach of the Agreement, because the matters set forth in the Dispute Notice, as well as the claims set forth in GE's Request for Arbitration, are all subject to resolution by the Independent Accounting Firm, and not the ICC.

61. As a result of Defendant's breaches, Plaintiffs have been injured and have suffered damage.

62. GE and Alstom agreed in the Agreement that "irreparable damage would occur and the [p]arties would not have an adequate remedy at [l]aw if any provision of th[e] Agreement is not performed in accordance with its specific terms or is otherwise breached."

63. GE and Alstom further specified that they would "be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement" and that they would "not . . . raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement."

11

## COUNT TWO

## PETITION TO COMPEL UNDER THE
## FEDERAL ARBITRATION ACT

64. Plaintiffs repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65. Section 3.05 of the Agreement, in setting forth a written agreement to submit certain matters for resolution by the Independent Accounting Firm, is a valid and enforceable agreement to arbitrate that is subject to Chapters 1 and 2 of the Federal Arbitration Act.

66. GE is required to submit for resolution by the Independent Accounting Firm all the matters sets forth in Alstom's Dispute Notice that remain unresolved as of the date of this action.

67. GE has refused to comply with the obligations set forth in Paragraph 66 hereof.

68. Under the Federal Arbitration Act, Alstom is entitled to an order compelling GE to participate in proceedings before the Independent Accounting Firm. *See* 9 U.S.C. § 4, 206.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Enter an order of specific performance requiring Defendant to abide by Section 3.05 of the Agreement.

2. Enter an order compelling Defendant (a) to jointly engage Deloitte (or, if Deloitte is unable or unwilling to serve, an alternative Independent Accounting Firm agreed to by the parties or appointed by the President of the Paris Commercial Court) to act as the Independent Accounting Firm; (b) to instruct the Independent Accounting Firm to resolve all the disputed matters set forth in Alstom's Dispute Notice under Section 3.05 of the Agreement; and (c) otherwise to participate in

proceedings before the Independent Accounting Firm consistent with Section 3.05 of the Agreement.

3. Enter an order preliminarily and permanently enjoining GE from pursuing the arbitration it has launched before the ICC and requiring GE to withdraw its Request for Arbitration and otherwise take all steps necessary to discontinue such arbitration.

4. Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED: New York, New York
May 13, 2016

Respectfully submitted,

**HOLWELL SHUSTER & GOLDBERG LLP**

By: /s/

Michael Shuster
Vincent Levy
Jayme Jonat
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151
mshuster@hsgllp.com
vlevy@hsgllp.com
jjonat@hsgllp.com

*Counsel for Alstom and Alstom Transport Holdings B.V.*