UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                          :
ALSTOM, et al.,                           :
                                          :
                          Plaintiffs,     :
                                          :
            -v-                           :
                                          :
GENERAL ELECTRIC COMPANY,                 :
                                          :
                          Defendant.      :
                                          :
------------------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____        │
│ DATE FILED: _01/10/2017_____         │
└─────────────────────────────────────┘
```

16-CV-3568 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In 2014, Plaintiffs Alstom and Alstom Transport Holdings B.V. (collectively, "Alstom")

agreed to purchase a rail-signaling business from Defendant General Electric Company ("GE")

for $800 million, subject to a post-closing purchase price adjustment process. The ultimate

question in this case, teed up by cross-motions for summary judgment and cross-motions to

compel arbitration, is whether a dispute over the purchase price adjustment should be decided by

an independent accounting firm or arbitrators from the International Chamber of Commerce

("ICC"). In light of the plain language of the parties' agreement, the Court agrees with Alstom

that the dispute must be submitted, in the first instance at least, to the independent accounting

firm. Accordingly, Alstom's motions for summary judgment and to compel submission of the

parties' dispute to the independent accounting firm are GRANTED, and GE's cross-motions for

summary judgment and to compel arbitration before the ICC are DENIED.

## BACKGROUND

The following facts are taken from the pleadings and the declarations submitted in

connection with the parties' cross-motions. *See, e.g.*, *Bansadoun v. Jobe-Riat*, 316 F.3d 171, 175

(2d Cir. 2003) ("In the context of motions to compel arbitration . . . , the court applies a standard similar to that applicable for a motion for summary judgment.").  The relevant facts are largely, if not entirely, undisputed — but, in any event, all inferences are drawn in GE's favor.  *See, e.g.*, *Russell v. Mimeo, Inc.*, No. 08-CV-5354 (RJS), 2008 WL 6559743, at *1 (S.D.N.Y. Oct. 29, 2008) (noting that, where a motion to compel is opposed on the ground that the parties did not agree to arbitrate, the court "should give the opposing party the benefit of all reasonable doubts and inferences that may arise").

**A.  The Master Purchase Agreement**

On November 4, 2014, GE and Alstom entered into a Master Purchase Agreement (the "Agreement") governing the sale of GE's rail-signaling business to Alstom for $800 million, to be paid at closing.  (Docket No. 42 ("Ascher Decl."), Ex. C ("GE Req. for Arbit.") ¶ 15; *see also id.*, Ex. A ("Agmt.")).  Because GE was to continue operating the business until closing, the Agreement also provided for a post-closing purchase price adjustment, defined as the "Final Positive (or Negative) Working Capital Adjustment."  (GE Req. for Arbit. ¶ 17; Agmt. § 3.05).  Specifically, under Section 3.05 of the Agreement, GE was to provide Alstom a "Proposed Working Capital Statement" and "Proposed Net Debt Statement" within sixty days of the closing date (Agmt. § 3.05(a)), to be prepared in accordance with the "Transaction Accounting Principles" ("TAPs"), agreed-upon principles that were memorialized as an exhibit to the Agreement (Agmt. § 3.07; Docket No. 29 ("Petrovic Decl."), Ex. 2 ("TAPs") at 15-16).  Alstom then had ninety days to review GE's proposed statements.  (Agmt. § 3.05(b)).  If Alstom disputed any item set forth in the proposed statements, Alstom was required to "deliver written notice . . . of the same" to GE — defined as "the Dispute Notice" — "specifying in reasonable

detail the basis for such dispute" and its proposed modifications.  (*Id*. § 3.05(c)).  Upon receipt of the Dispute Notice, the parties had thirty days — defined as the "Resolution Period" — during which to "negotiate in good faith to reach an agreement as to any matters identified" in the dispute notice.  (*Id.*).

Most relevant here, Section 3.05(d) of the Agreement provides that if the parties "fail to resolve all such matters in dispute within the Resolution Period, then . . . any matters identified in such Dispute Notice that remain in dispute following the expiration of the Resolution Period shall be finally and conclusively determined by" Deloitte Touche Tohmatsu Limited ("Deloitte") (or, if Deloitte is unable or unwilling to serve in such capacity, another globally recognized accounting firm), defined as the "Independent Accounting Firm" ("IAF").  (*Id*. § 3.05(d)).  Section 3.05(e) of the Agreement further provides that the parties "shall instruct" the IAF "to promptly, but no later than forty (40) days after its acceptance of its appointment, determine (it being understood that in making such determination, the [IAF] shall be functioning as an expert and not as an arbitrator), based solely on written presentations of [the parties] . . . and not by independent review, only those matters in dispute."  (*Id*. § 3.05(e)).  Like the parties, the IAF is bound to decide any disputed items in accordance with the TAPs.  (*Id*. § 3.07).  The Agreement provides that the IAF's "written report setting forth its determination as to the disputed matters and the resulting calculation . . . will be conclusive and binding upon all [p]arties absent manifest error or gross negligence."  (*Id*. § 3.05(e)).

Complicating matters, however, the Agreement contains a separate section providing for arbitration by the ICC of any dispute not committed to the IAF.  Specifically, Section 15.13 of the Agreement states, in relevant part, as follows: "Except as set forth in Section 3.05 with

respect to any disputes to be resolved by the [IAF], . . . any Transaction Dispute shall be finally resolved under Rules of Arbitration of the [ICC] (the "Rules") by three (3) arbitrators appointed in accordance with the Rules."  (*Id*. § 15.13).  Section 15.12 of the Agreement defines a "Transaction Dispute" broadly to include "any Action arising out of or relating in any way to [the Agreement], whether in contract, tort, common law, statutory law, equity, or otherwise, including any question regarding its existence, validity, or scope."  (*Id*. § 15.12).

## B.  Procedural History

On January 4, 2016, approximately two months after the closing date, GE delivered its Proposed Working Capital and Proposed Net Debt Statements to Alstom.  (Petrovic Decl. ¶ 4). Each statement was a single page in length.  (Petrovic Decl., Ex. 3 ("Dispute Notice"), Ann. I-II).  On April 4, 2016 — within the ninety-day review period — Alstom delivered to GE a 112-page Dispute Notice taking issue with thirty-eight items.  (Petrovic Decl. ¶ 5; Dispute Notice). (For present purposes, the specifics of the parties' positions on the purchase price adjustment — which are subject to a confidentiality agreement between the parties — are irrelevant; it suffices to say that there is a substantial difference between the parties with respect to the size of the adjustment.)

After some back and forth, including negotiations over extending the Resolution Period, GE notified Alstom in writing that it did not believe many of the issues in the Dispute Notice were appropriate for resolution by the IAF.  (Docket No. 30 ¶ 4; *id.*, Ex. 1).  Specifically, although GE conceded that half of the thirty-eight items were within the scope of Section 3.05 and for the IAF to decide, it asserted that the other half challenged its business and engineering judgments rather than its application of accounting principles and were for the ICC to resolve

under Sections 15.12 and 15.13.  (Docket No. 41 ("GE Opp'n") at 3).

A few days later, on May 9, 2016, GE informed Alstom via letter that it had requested arbitration before the ICC pursuant to Section 15.13 of the Agreement.  (Petrovic Decl. ¶ 17; *id.*, Ex. 13 ("May 9, 2016 Letter")).  In particular, GE sought arbitration on two issues: first, that nineteen of Alstom's disputed items were "outside the scope of the working capital adjustment process" and so the IAF was without authority to decide those items; and second, that Alstom's Dispute Notice did not provide "reasonable detail" for the disputed items, rendering it inadequate.  (May 9, 2016 Letter).   On May 13, 2016, Alstom initiated the instant action. (Docket No. 14).  Alstom now moves for summary judgment and to compel GE to submit the dispute to the IAF (Docket No. 26); GE cross-moves for summary judgment and moves either to stay the proceedings pending arbitration before the ICC or to compel such arbitration.  (Docket Nos. 38 & 48).

## DISCUSSION

The parties' ultimate disagreement is over who should decide their purchase price adjustment dispute.  GE concedes that nineteen of the thirty-eight issues raised by Alstom in its Dispute Notice should be decided by the IAF under Section 3.05 of the Agreement, but contends that the other nineteen issues should be submitted to the ICC pursuant to Section 15.13.  By contrast, Alstom argues that all of the issues raised in its Dispute Notice should be submitted to the IAF.  But the threshold question is not who should decide the purchase price adjustment dispute itself.  The threshold (that is, logically prior) question is who should decide the very question of who decides — sometimes called the "the question of arbitrability."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2000) (internal quotation marks omitted).  GE

argues that the ICC should decide whether it or the IAF should resolve the disputed items in Alstom's Dispute Notice because Section 15.13 of the Agreement provides that "any Transaction Dispute shall be" resolved by the ICC and Section 15.12 defines "Transaction Dispute" to include "any question regarding" the Agreement's "scope." (*See* Docket No. 49 ("GE Mtn. to Stay") at 12-15). By contrast, Alstom argues that the question of arbitrability is one for the Court to decide. (*See* Docket No. 54 ("Alstom Reply") at 3-7).

Alstom plainly has the better of this threshold argument. It is well established that "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam*, 537 U.S. at 83 (internal quotation marks, brackets, and emphasis omitted). The presence of a broadly worded arbitration clause along the lines of Section 15.13 would normally satisfy this "clear and unmistakable" standard. *See, e.g.*, *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996). But Section 3.05, the purchase price adjustment dispute-resolution provision, is itself an arbitration clause. *See, e.g.*, *Talegen Holdings, Inc. v. Fremont General Corp.*, 98-CIV-366 (DC), 1998 WL 513066, at *3 (S.D.N.Y. Aug. 19, 1998) (noting that "[c]ourts have consistently found that purchase price adjustment dispute resolution provisions . . . constitute enforceable arbitration agreements"). And where, as here, "a single agreement contains both a broadly worded arbitration clause and a specific clause assigning a certain decision to an independent accountant," it "cannot" be said "that the parties' intention to arbitrate questions of arbitrability under the broad clause remains clear." *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002). Instead, "the presence of both these clauses creates an ambiguity," which, in turn, requires that "questions of arbitrability" be decided by a court, not by an

arbitrator.  *Id.*; *accord SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, No. 14-CV-2270 (JMF),

2014 WL 6603951, at *1 & n.1 (S.D.N.Y. Nov. 20, 2014).

      GE's arguments to the contrary are meritless.  First, GE asserts that "scope" questions are

explicitly committed to the ICC under Sections 15.12 and 15.13 of the Agreement.  (*See* GE

Mtn. to Stay 14-15).  But that argument conspicuously ignores the opening phrase of Section

15.13, which expressly carves out from ICC arbitration "any disputes to be resolved" by the IAF

under Section 3.05.  Put simply, GE "cannot carry [its] burden" of identifying "a clear and

unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration . . . .

by pointing to a broad arbitration clause that the parties subjected to a carve-out provision."

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).  Additionally,

GE contends that Section 15.13 "incorporates the ICC Rules, which expressly grant arbitrators

authority to decide the scope of their jurisdiction," and that such "'incorporation serves as clear

and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'"  (GE

Mtn. to Stay 12-14 (quoting *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir.

2005)).  As in *NASDAQ OMX Grp., Inc.*, however, the Agreement "does not clearly and

unmistakably direct that questions of arbitrability be decided by [ICC] rules; rather, it provides

for [ICC] rules to apply to such arbitrations as may arise under the Agreement."  770 F.3d at

1032.  Under the plain terms of Section 15.13, the carve out for disputes to be resolved by the

IAF under Section 3.05 "delays application of [ICC] rules until a decision is made as to whether

a question does or does not fall within the intended scope of arbitration, in short, until

arbitrability is decided."  *Id.*[1]

---

[1]     GE also suggests that this case is distinguishable from *Katz* because it involves an
international agreement (*See* GE Mtn. to Stay 14), but that suggestion is unpersuasive.  *See, e.g.*,

The Court turns, then, to the parties' central disagreement: whether all or only some of the issues raised in Alstom's Dispute Notice should be submitted to the IAF.  When an agreement, such as the one at issue here, "includes two dispute resolution provisions, one specific (a valuation provision) and one general (a broad arbitration clause), the specific provision will govern those claims that fall within it."  *Katz*, 290 F.3d at 97.  To determine whether the claims at issue here "fall within" the scope of Section 3.05, the IAF provision, the Court must conduct a three-part inquiry.  *See, e.g.*, *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).  First, the Court must determine whether the clause is broad or narrow.  *See id.*  Second, if reviewing a narrow clause, it must determine whether the dispute "is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause."  *Id.* (internal quotation marks omitted).  And third, for narrow arbitration clauses, the Court should generally find a collateral issue to fall outside of the clause, while for broad clauses there is a presumption of arbitrability.  *See id.  But see Chevron U.S.A. Inc. v. Consol. Edison Co. of N.Y., Inc.*, 872 F.2d 534, 537-38 (2d Cir. 1989) (stating that "even a narrow arbitration clause must be construed in light of the presumption in favor of arbitration," although "the court is not free to disregard the explicit boundaries set by the agreement").

At the first step, there are no "fixed rules" governing the determination of whether an arbitration clause is broad or narrow.  *Louis Dreyfus Negoce S.A.*, 252 F.3d at 225.  Instead, the Court "must determine whether, on the one hand, the language of the clause, taken as a whole,

---

*Telenor Mobile Comms. AS v. Storm LLC*, 584 F.3d 396, 406 (2d Cir. 2009) ("The presumption that the court should decide arbitrability questions also applies when a party seeks to compel arbitration [pursuant to an international agreement] under the New York Convention.").

evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Id.* Meanwhile, at the second step — determining whether a narrow arbitration clause covers a particular agreement — a court looks to "the factual allegations in the complaint rather than the legal causes of action asserted." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999); *see S. New England Tel. Co. v. Global Naps, Inc.*, No. 04-CV-2075 (JCH), 2006 WL 1169805, at * 7 (D. Conn. Apr. 28, 2006) (applying *Smith/Enron* in the context of a narrow arbitration clause). An issue is collateral — and therefore not covered by a narrow arbitration clause — only if it is "a separate, side agreement, connected with the principal contract which contains the arbitration clause." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983). If, however, a dispute "arises under the main agreement but requires determination of a sub-issue," it is "inextricably tied up with the merits of the underlying dispute" and, therefore, arbitrable even under a narrow clause. *Id.*

Section 3.05 of the Agreement is a narrow clause. Rather than applying generally to disputes "arising out of" or "in connection with" the Agreement, it is limited to disputes over the Proposed Working Capital Statement and Proposed Net Debt Statement. *See Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 583 (S.D.N.Y. 2014) (citing cases). *But cf. Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 81 (S.D.N.Y. 1992) (describing a clause similar to the one at issue here as "technically a 'narrow' one in that it does not provide for arbitration of all disputes between the parties," but also "'broad' insofar as it does not restrict the scope of objections to the Closing Net Book Value that may be brought before [the independent

9

accountant]").  Nevertheless, the plain language of the clause compels the Court to conclude that
the issues raised by Alstom in its Dispute Notice must be submitted to the IAF in the first
instance.  *See, e.g.*, *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) ("It
is axiomatic that where the language of a contract is unambiguous, the parties' intent is
determined within the four corners of the contract, without reference to external evidence.").
Critically, Section 3.05(d) expressly provides — "without exception or limitation," *HBC*
*Solutions, Inc. v. Harris Corp.*, 13-CIV-6327 (JMF), 2014 WL 6982921, at *5 (S.D.N.Y. Dec.
10, 2014) — that "*any* matters identified in [the] Dispute Notice that remain in dispute . . . shall
be finally and conclusively determined by" the IAF.  (Agmt. § 3.05(d) (emphasis added)).
Courts in this Circuit have consistently held that broad and unqualified language of that sort
means what it says and encompasses "any" — or, at a minimum, virtually "any" — dispute.  *See,*
*e.g.*, *Seed Holdings*, 5 F. Supp. 3d at 583-84 (holding that a "dispute over the propriety of
adjustments for non-compliance" with accounting principles fell "within the scope of the
arbitration clause" because the agreement set "no explicit limits on the type of objections to the
calculation of working capital that may be raised before the arbitrators"); *Talegen Holdings*,
1998 WL 513066, at *4 (finding significant the fact that "no language in [the accounting
provision] expressly exclude[ed] any particular type of Acquisition Audit or purchase price
dispute from arbitration").  There is no basis to reach a different conclusion here.

  The unqualified language of Section 3.05 stands in sharp contrast to the language at issue
in *XL Capital, Ltd. v. Kronenberg*, No. 04-CV-5496 (JSR), 2004 WL 2101952 (S.D.N.Y. Sept.
20, 2004), *aff'd*, 145 F. App'x 384 (2d Cir. 2005) (summary order), upon which GE places heavy
reliance.  (*See* GE Opp'n 21-23).  Similar to the parties here, the parties there broadly agreed to

arbitrate "all questions, issues or disputes" arising under their agreement before the American
Arbitration Association ("AAA"), but carved out a subset of disputes to be resolved by an
accountant.  *See XL Capital, Ltd.*, 2004 WL 2101952, at *1.  Significantly, however, the parties
defined that subset substantively to include only "questions, issues or disputes . . . *with respect to
the calculations of the Cashout Payment and the Earned Payout Amount*."  *Id.* (emphasis added).
Relying on that limiting language, Judge Rakoff had no trouble concluding that the respondents'
claims of fraud and deceitful conduct, negligent misrepresentation, breach of contract, breach of
the covenant of good faith and fair dealing, and the like were for the AAA, not the accountant, to
decide.  "The issues," he reasoned, "are not, in their essence, accounting issues, let alone issues
that directly respect the 'calculation' of the Earned Payout Amount, which is the subject matter
of [the accountant clause]."  *Id.* at *2.  On appeal, the Second Circuit reached the same result and
for the same reason.  The language of the accounting clause, the Court of Appeals explained,
"requires a close relationship of the disputed issue to the process of arriving at the final earnout
amount."  145 F. App'x at 385.

Here, unlike in *XL Capital*, the purchase price adjustment dispute-resolution provisions
do not substantively limit the kinds of disputes to be delegated to the IAF; they require only that
a dispute be included in the Dispute Notice and remain unresolved.  That is not to say that *any*
claim would be subject to resolution by the IAF simply because Alstom chose to include it in the
Dispute Notice.  As this Court observed in *HBC Solutions*, "there may well be claims whose link
to the [purchase price adjustment dispute-resolution provisions of the Agreement] would be so
attenuated that it would not be 'a plausible interpretation' of the Agreement to find the claims
arbitrable" by the IAF.  2014 WL 6982921, at *5 n.1 (quoting *Chung & President Enters. Corp.*,

11

943 F.2d 225, 230 (2d Cir. 1991)).  But that is not the case here.  Although GE contends that the

disputed items impermissibly challenge its engineering and business judgments (*See, e.g.*, GE

Opp'n 1-3, 20-21), the issues raised by Alstom are not merely collateral to the determination of

the Final Working Capital; to the contrary, Alstom has laid out — in a more than plausible

manner — the specifics of its objections and the accounting principles upon which each

objection is based.  (*See* Petrovic Decl., Ex. 3).  The mere fact that the issues raised by Alstom

call for more than "bean-counting" does not take them outside the scope of the purchase price

adjustment dispute-resolution provisions.  *Alliant Techsystems, Inc. v. MidOcean Bushnell

Holdings, L.P.*, C.A. No. 9813-CB, 2015 WL 1897659, at *11 (Del. Ch. Apr. 24, 2015); *see also*,

*e.g.*, *Seed Holdings*, 5 F. Supp. 3d at 584 ("[T]he calculation of working capital for the purpose

of making a purchase price adjustment necessarily entails resolving the proper accounting

methodology to be used."); *Talegen Holdings, Inc.*, 1998 WL 513066, at *6 ("As courts have

consistently found, accounting methods are integral to the derivation of calculations related to

closing balance sheets.  Hence, disputes regarding the accounting methods are also disputes

regarding the calculations in the financial statements." (internal quotation marks, ellipsis, and

citations omitted)).

GE's efforts to avoid the implications of the unqualified language of Section 3.05 to

which it agreed are unavailing.  As it did in arguing that the ICC should decide the question of

arbitrability, GE points first to the broad language of Sections 15.12 and 15.13.  (*See* GE Mtn. to

Stay 16-21).  But, again, that argument ignores the beginning of Section 15.13, which carves out

any disputes that fall within the scope of Section 3.05.  *See, e.g.*, *HBC Solutions*, 2014 WL

6982921, at *7.  Somewhat more compellingly, GE relies on the language in Section 3.05(e) of

the Agreement providing that the IAF "shall" function "as an expert and not as an arbitrator" to argue that "the parties specifically cabined the review of the IAF." (GE Opp'n 22-23). But that language merely "means that [the IAF] will resolve the dispute as accountants do — by examining the corporate books and applying normal accounting principles plus any special definitions the parties have adopted — rather than entertaining arguments from lawyers and listening to testimony. It does not imply that the whole section of the contract committing the resolution to an independent private party is hortatory." *Omni Tech Corp. v. MPC Sols. Sales LLC*, 432 F.3d 797, 799 (7th Cir. 2005). And in any event, the phrase is not sufficient, in itself, to override the plain language of Section 3.05(d), committing "*any* matters identified in [the] Dispute Notice that remain in dispute" (or, at a minimum, "any" such matters that plausibly relate to calculation of the Final Positive (or Negative) Working Capital Adjustment) to the IAF. (Agmt. § 3.05(d) (emphasis added)). Mindful that GE's and Alstom's accounting and finance staffs prepared the documents currently at issue, there is simply no reason to believe that the IAF, even acting as an accounting "expert," is not in a position (let alone the best position) to evaluate whether GE complied with the TAPs in producing its proposed statements. (*See* Docket No. 55 ("Bialecki Decl.") 19-24).

Finally, relying principally on *Cytec Industries, Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, No. 14-CV-1561 (PKC), 2015 WL 3762592, at *7 (S.D.N.Y. May 15, 2015), and *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352 (2003), GE argues that the disputed items actually fall within the scope of the "representation and warranties" provisions of the Agreement (or raise claims that would have fallen within the scope of representation and warranties that were not included in the final Agreement), and thus are legal arguments improperly disguised as

accounting disagreements.  (GE Opp'n 23-25).  The Court, however, considered and rejected much the same argument in *HBC Solutions*, and its reasoning there applies with equal force here. First, as with the parties' agreement in *HBC Solutions*, the Agreement in this case explicitly carves out disputes that are to be resolved by the IAF pursuant to Section 3.05.  *See HBC Solutions*, 2014 WL 6982921, at *7.  Second, unlike the agreements in *Cytec Industries* and *Westmoreland*, the Agreement here does not make indemnification the exclusive remedy for claims that might otherwise fall within the scope of its "representation and warranties" provisions.  *See Cytec Indus.*, 2015 WL 3762592, at *7-8; *Westmoreland Coal Co.*, 100 N.Y.2d at 527-28.  To the contrary, Section 15.14(a) of the Agreement explicitly states that "all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby," and Sections 14.02 and 14.06 bar double recovery for losses via indemnification and the purchase price adjustment process.  (*See also* Agmt. § 14.05).  "If anything," therefore, the Agreement "appears to contemplate that some disputes could be pursued either through the Purchase Price Adjustment procedures or through indemnification (albeit not through both)."  *HBC Solutions*, 2014 WL 6982921, at *6-7; *accord Seed Holdings*, 5 F. Supp. 3d at 584-85 (holding similarly and citing cases).

GE's "representation and warranties" argument fails for an additional reason: At bottom, it relates to the merits, not to whether the claims should be submitted to the IAF in the first instance.  The Second Circuit's decision in *Chung* is instructive.  In that case, the parties had agreed to arbitrate only breach-of-warranty disputes.  When the buyer sought to compel arbitration, the seller argued — not unlike GE here — that the buyer's claims were merely disguised warranty claims and thus outside the scope of the narrow arbitration agreement.  The

Court of Appeals rejected the argument, describing it as one "directed at the merits of the dispute rather than the issue of arbitrability." 943 F.2d at 230.  Concluding that there was "an interpretation of the parties' agreement that cover[ed] the disputes at issue," the Court held that arbitration was required, even though the arbitrator might "subsequently agree with [the seller's] interpretation of the agreement." *Id.*  So too here, there is plainly "an interpretation" of Section 3.05 that "covers" the issues raised by Alstom in its Dispute Notice. *Id.*  It follows that they must be submitted in the first instance to the IAF, even if the IAF might "subsequently agree" with GE that the items cannot be resolved by reliance on the TAPs alone, and require consideration of the Agreement's representations and warranties. *Id.*

This last point underscores an important limitation to the Court's holdings.  Under Section 3.05, the IAF is bound to decide any disputed items "as an expert" and in accordance with the TAPs.  (*See* Agmt. §§ 3.05, 3.07).  In holding that the disputed items must be submitted to the IAF in the first instance, the Court does not reach, let alone answer, the question of whether the disputed items can be resolved on those bases alone.  GE is free to argue in its submissions to the IAF, as it does here (GE Opp'n 1-3, 20-21), that Alstom's arguments rely on more than mere accounting and the TAPs.  Moreover, any decision by the IAF on that score is thereafter subject to review for "manifest error or gross negligence."  (Agmt. § 3.05(e)).  In other words, borrowing from the Second Circuit's warning in *XL Capital*, the Court "caution[s] that [its] conclusion . . . is not a back door permitting" non-accounting issues "to be brought before" the IAF, and notes that disputes may well remain for the ICC to decide even after the IAF "resolves the issues before it."  145 F. App'x at 385-86.  But these are arguments that GE must

make in the first instance to the IAF, not to this Court or to the ICC.[2]

## CONCLUSION

In short, given the language of the Agreement and the undisputed facts, the Court concludes that the parties' disputes must be submitted in the first instance to the IAF, not the ICC.  *See* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court *shall* make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." (emphasis added)); *see also Severstal U.S. Holdings, LLC v. RG Steel, LLC*, 865 F. Sup. 2d 430, 438 (S.D.N.Y. 2012) (noting there is "no place for the exercise of discretion by a district court" in enforcing this mandatory remedy).  Accordingly, Alstom's motion for summary judgment and to compel submission to the IAF is GRANTED, and GE's cross-motions — which, in one way or another, seek to compel arbitration before the ICC — are DENIED.[3]

One final question remains: whether the Court should enter judgment and close the case

---

[2]    Similarly, any argument that Alstom's Dispute Notice was insufficiently detailed to trigger the purchase price adjustment dispute-resolution process under Section 3.05 must be made to the IAF in the first instance.  *See, e.g.*, *SOHC, Inc. v. Zentis Sweet Ovations Holding LLC*, No. 14-CV-2270 (JMF), 2014 WL 5643683, at *3 (S.D.N.Y. Nov. 4, 2014) (noting that procedural disputes over preconditions to an arbitration are for the arbitrator to decide).

[3]    Additionally, Alstom's motion, on consent, for leave to file certain exhibits under seal or in redacted form is GRANTED.  (Docket Nos. 21 ("Pl.'s Req. to Seal") & 23; *see also* Docket No. 24 (sealing certain materials temporarily)).  The information the parties seek to keep confidential reflects their substantive positions as to the underlying accounting dispute that is to be decided by the IAF, not by this Court.  In light of that, the Court agrees with Alstom that the material is not subject to the presumption in favor of public access — or, if it is, that the presumption in favor of access is weak.  *See, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).  Moreover, the parties' proposed redactions are limited to "confidential and commercially sensitive information regarding the rail-signaling business" (Pl.'s Req. to Seal at 3), the disclosure of which would potentially harm both parties.  *See*, *e.g.*, *SOHC*, 2014 WL 5643683, at *5 (granting a similar request).

or stay proceedings pending arbitration before the IAF.  Section 3 of the Federal Arbitration Act requires a district court to stay proceedings where an issue before it requires arbitration, *see* 9 U.S.C. § 3, but a district court has discretion to dismiss, rather than stay, an action where, as here, all of the issues in the case must be arbitrated, *see Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002).  The Second Circuit has urged district courts to be "be mindful of the fact that a dismissal is appealable whereas a granting of a stay is not, and '[u]nnecessary delay of the arbital process through appellate review is disfavored.'" *HBC Solutions*, 2014 WL 6982921, at *9 (quoting *Salim Oleochemicals*, 278 F.3d at 93).  The Court will therefore stay the proceedings pending arbitration of Alstom's claims by the IAF.

The Clerk of Court is directed to terminate Docket Nos. 26, 38, 48, and 62.  Further, as there is no reason to keep the case open pending the arbitration, the Clerk is directed to administratively close the case without prejudice to either party moving by letter motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.

SO ORDERED.

Dated: January 10, 2017
       New York, New York

JESSE M. FURMAN
United States District Judge